# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

JOSEPH CORCORAN, D.O.,          CASE NO: 8:25-cv-00105-SDM-NHA

      Plaintiff,

v.

HCA, INC., FAR WEST DIVISION,
INC., HCA MANAGEMENT
SERVICES, L.P., HEALTHTRUST
WORKFORCE SOLUTIONS, LLC, HCA
HOLDINGS, INC., and MERRILL
LYNCH, PIERCE, FENNER & SMITH,
INC.,

      Defendants.

_____/

## FIRST AMENDED COMPLAINT

Plaintiff, JOSEPH CORCORAN, D.O., files his First Amended Complaint against Defendants, HCA, INC., FAR WEST DIVISION, INC., HCA MANAGEMENT SERVICES, L.P., HEALTHTRUST WORKFORCE SOLUTIONS, LLC, HCA HOLDINGS, INC., and MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. (collectively "Defendants"), and alleges as follows:

### Jurisdiction and Venue

1.      This is an action for damages exceeding $50,000.00.

2.      Jurisdiction is proper under Section 48.193(1), Florida Statutes, given that the Defendants (1) operated, conducted, engaged in, and carried on a business or business venture in this state or have an office in this state; (2) committed tortious acts within this state; (3) owned, used, or possessed real property within this state; (4) caused injury to persons within this state while Defendants were engaged in solicitation or service activities within this state; and (5) breached a contract in this state by failing to perform acts required by the contract to be performed in this state. Jurisdiction is also proper under Section 48.193(2), Florida Statutes, given that Defendants are engaged in substantial, non-isolated activity within this state.

3.      Venue is proper in the Thirteenth Judicial Circuit, in and for Hillsborough County, Florida, under Sections 47.011 and 47.051, Florida Statutes. The causes of action alleged herein occurred in Hillsborough County. Defendants that are domestic corporations have offices for the transaction of their customary businesses in Hillsborough County. The Defendants that are foreign corporations all have agents or other representatives in Hillsborough County.

**Parties**

4.      Plaintiff, JOSEPH CORCORAN, D.O. ("DR. CORCORAN" or "Plaintiff"), is, and at all times material hereto has remained, a Hillsborough County, Florida resident.



5.     Defendant, HCA, INC. ("HCA"), is an active for-profit corporation licensed to do business in Florida and operated at all relevant times to this lawsuit a hospital in Hillsborough County, Florida, named HCA Florida Brandon Regional Hospital ("Brandon Hospital") located at 119 Oakfield Dr., Brandon, FL 33511. HCA operates 650+ affiliated care sites across the state and provides care to millions of families who call Florida home.

6.     Defendant FAR WEST DIVISION, INC., ("FAR WEST DIVISION"), is a for-profit corporation registered as a foreign business in Nevada and originally incorporated in California and submitted to jurisdiction in Florida by committing tortious acts within this state and breaching a contract in this state.

7.     Defendant HCA MANAGEMENT SERVICES, L.P. ("HCA MANAGEMENT SERVICES"), is a Foreign Limited Partnership registered to do business in Florida and submitted to jurisdiction in Florida by committing tortious acts within this state and breaching a contract in this state.

8.     Defendant HEALTHTRUST WORKFORCE SOLUTIONS, LLC ("HEALTHTRUST WORKFORCE SOLUTIONS" or "HWS") is an active foreign limited liability company licensed to do business in Florida. It is an interim staffing company placing temporary employees at any of HCA's 180+ hospitals nationwide, including those in Hillsborough County, Florida, and is wholly owned by HCA.



9.      Defendant, HCA HOLDINGS, INC. ("HCA HOLDINGS"), is a Florida profit corporation with unknown status. Upon information and belief, Plaintiff's stock-based compensation is governed in part by the "Plan", a 2006 document setting forth the stock incentive plan. Plaintiff believes a more recent, amended document exists, but is not in possession of any post-2006 Plan.

10.     Defendant, MERRILL LYNCH, PIERCE, FENNER & SMITH INC. ("MERRILL LYNCH") is an active for-profit corporation licensed to do business in Florida that managed the stock-based compensation accounts on behalf of HCA and its employee beneficiaries.

### Common Factual Allegations

11.     In 2013, DR. CORCORAN became a full-time Chief Medical Officer (CMO) for HCA.

12.     During his ten (10)-plus years of service with HCA, DR. CORCORAN'S performance earned him a promotion from hospital-level to Division-level CMO and substantial stock compensation awards.

13.     As the facility's Chief Medical Officer between 2013 and 2018, DR. CORCORAN helped lead the Quality of Patient Care transformation at Brandon Hospital, improving its standing from the bottom quartile of HCA hospitals to the top decile, and raising Brandon Hospital's Leapfrog Hospital Safety Rating from a "D" to an "A."



14.    As early as Q1 2014, DR. CORCORAN became eligible for HCA's Stock Compensation Plan (the "Plan"). Initially, he earned Restricted Stock Units (RSU) and Performance Stock Units (PSU). This occurred when HCA expanded the Plan to include CMOs serving its largest and most prominent facilities.

15.    In Q4 2018, DR. CORCORAN was promoted to Division Chief Medical Officer ("DCMO") for FAR WEST DIVISION, overseeing eight (8) HCA acute care hospitals in California and Nevada from a base in Henderson, Nevada.

16.    Along with this promotion, DR. CORCORAN continued to excel within HCA, earning additional annual RSU and PSU grants. He was also granted additional stock-based compensation in the form of Stock Appreciation Rights (SARs).

17.    These SARs were granted to DR. CORCORAN by HCA and FAR WEST DIVISION annually and vested during his continuing service to HCA and FAR WEST DIVISION.

18.    In connection with DR. CORCORAN's stock-based compensation, HCA introduced DR. CORCORAN to MERRILL LYNCH who, at all times relevant to this action, managed and acted as a fiduciary for HCA's employees who earned stock-based compensation.



19.    MERRILL LYNCH managed and facilitated HCA's Stock Compensation Program and, in that role, managed the stock-based compensation for DR. CORCORAN and many other HCA executives.

20.    DR. CORCORAN did not have a business relationship with MERRILL LYNCH until early 2014, when HCA opened accounts on his behalf to facilitate MERRILL LYNCH's management and oversight of DR. CORCORAN'S stock-based compensation.

21.    DR. CORCORAN regularly viewed his stock-based compensation in the form of RSUs, PSUs, and SARs on the various MERRILL LYNCH/HCA platform(s), including those known as HCARewards.com, BConnected, MyMerrill.com, BenefitsOnline.com, and MyFinancialPicture.com.

22.    The MERRILL LYNCH/HCA platforms displayed the SARs and stock-based compensation awarded to DR. CORCORAN during his service with HCA and included data fields indicating the grant date, the number of shares, the vesting date, the grant price, and the deadline to exercise his rights.[1]

23.    DR. CORCORAN's 2018 promotion to DCMO required him to relocate from his home in Florida to FAR WEST DIVISION headquarters in Nevada, including nearly three (3) years of living 2,000 miles apart from his family

---

[1] The Status Change Letter attached below as *Exhibit 2* contains a subset of the information viewable on the various MERRILL LYNCH/HCA platforms.



– his loving wife, daughter, and son. When possible, DR. CORCORAN would travel home to Tampa, Florida, to spend cherished time with his family, a cross-country travel schedule impeded by the COVID pandemic.

24. With this promotion in 2018, HCA and FAR WEST DIVISION granted DR. CORCORAN additional stock-based compensation, including approximately 4,880 Stock Appreciation Rights (SARs).

25. From 2014 to 2022, HCA and FAR WEST DIVISION granted DR. CORCORAN RSU and PSU units. Following his promotion to DCMO, HCA, and FAR WEST DIVISION granted DR. CORCORAN additional SARs each subsequent year. DR. CORCORAN received additional stock-based compensation (RSUs, PSUs, and SARs) in 2019, 2020, 2021, and 2022.

26. HCA granted DR. CORCORAN the SARs each year subject to the Stock Appreciation Rights Agreement then in effect, which bound HCA and its subsidiaries. *See the* Stock Appreciation Rights Agreements *attached as* **Composite Exhibit 1.**

27. After his daughter was hospitalized for several days in the  Pediatric Intensive Care Unit in February 2021, and after he encountered repeated multi-day delays in getting to her bedside due to weather-related travel disruptions, DR. CORCORAN initiated discussions with his two immediate supervisors, HCA National Group Chief Medical Officer Dr. Michael Schlosser and FAR WEST



DIVISION President Brian Cook, requesting transfer to an appropriate role closer to his family in Tampa, FL.

28.    In September 2021, after commuting cross-country between Las Vegas and Tampa for nearly three (3) years, DR. CORCORAN and HCA agreed that DR. CORCORAN could return to Tampa and his wife and teenage children, and continue to explore appropriate opportunities within HCA closer to his family's Tampa home.

29.    HCA, FAR WEST DIVISION, HCA MANAGEMENT SERVICES, and DR. CORCORAN agreed in 4Q 2021 that DR. CORCORAN would return to Tampa on a full-time basis and HCA would work with DR. CORCORAN to find him a suitable role within HCA in the local market (Tampa and surrounding communities).

30.    Over the intervening five (5) months, the only full-time role HCA offered DR. CORCORAN was as the facility CMO at Blake Hospital in Bradenton, FL, a hospital far smaller than Brandon Hospital (where DR. CORCORAN had previously excelled), with a long-standing reputation centered on a highly dysfunctional medical staff and chronically underperforming administrative teams. DR. CORCORAN declined this offer as the multi-hour round trip commute hardly fulfilled the goal of such a transfer within HCA and was effectively a demotion from his Division (DCMO) role within FAR WEST DIVISION.



31.     On February 1, 2022, unable to find reasonable full-time opportunities within HCA in the local market, DR. CORCORAN entered into a Separation Agreement with FAR WEST DIVISION and HCA MANAGEMENT SERVICES, effective March 1, 2022. HCA had complete knowledge of the Separation Agreement. *See the* Separation Agreement *attached as **Exhibit 2***.

32.     The Separation Agreement included release language but precisely carved out DR. CORCORAN's "right to receive a full-year share of incentive reward under the Company's Performance Excellence Program on/about March 11, 2022, and any other accrued benefits as required by law (including the vested portion of Employee's account under any incentive compensation, retirement or deferred compensation plan)."

33.     Concurrent with the execution of the Separation Agreement, HCA facilitated DR. CORCORAN's transfer to HEALTHTRUST WORKFORCE SOLUTIONS, HCA's wholly-owned staffing company, to join and consider Interim CMO roles.

34.     Importantly, HCA, FAR WEST DIVISION, HCA MANAGEMENT SERVICES, and HWS share and co-manage many systems, including a human resources information system ("HRIS"). In other words, the transition was seamless, and DR. CORCORAN's access to many HCA resources and functions



remained uninterrupted. HCA's stated goal was to keep DR. CORCORAN within its system, even if he would be formally employed by one of HCA's subsidiaries.

35.    After DR. CORCORAN joined HWS, he continued using HCA resources and programs including, but not limited to, his HCA-issued laptop, his HCA Corporate American Express card, his HCA email account, and other company resources, including BConnected, a benefits portal maintained by HCA.

36.    On March 1, 2022, DR. CORCORAN received an email from HWS affirming that he had "been provided access to HealthTrust Workforce Solutions' Workforce 2.0 System". On March 3, 2022, DR. CORCORAN received a "Welcome Letter" via email and was cleared to start his first HWS assignment as Interim CMO at HCA's Bayonet Point Hospital (located just north of Tampa). DR. CORCORAN worked in this role as Interim CMO from March through late June 2022.

37.    On March 4, 2022, Merrill Lynch received a weekly HRIS status update from HCA, according to Kevin Barnes, DR. CORCORAN's Merrill Lynch Advisor. The HRIS status update (a data feed from HCA's Human Resources Information System) flowed through MERRILL LYNCH's systems, which continued to reflect a ten (10)-year exercise window for DR. CORCORAN's SARs.

38.    DR. CORCORAN properly understood the information provided by HCA and MERRILL LYNCH through HRIS to mean he enjoyed a ten (10)-year



window in which to exercise his stock options, even after his "separation" from FAR WEST DIVISION and transition to HWS.

39.    Shortly after DR. CORCORAN's execution of the Separation Agreement and transition to HWS, DR. CORCORAN received a Status Change Letter from HCA and MERRILL LYNCH dated March 6, 2022, notifying DR. CORCORAN that the Exercise Dates for his SARs remained on the ten (10)-year exercise schedule customarily provided to HCA employees. *See the* Status Change Letter *attached as* **Exhibit 3.**

40.    HCA employees who remained active with HCA or retired from HCA were given ten (10) years to exercise their SAR stock grants.

41.    The Status Change Letter reflected the 8,560 SARs HCA had granted DR. CORCORAN during his service.

42.    DR. CORCORAN reasonably relied upon the Status Change Letter, notifying him that his "Last Date to Exercise" his SARs continued to fall on various dates in 2029, 2030, and 2031. DR. CORCORAN's reliance was further justified by MERRILL LYNCH's confirmation on March 4, 2022 that the HRIS status update continued to reflect the 2029, 2030, and 2031 exercise deadlines in HCA's and MERRILL LYNCH's systems.

43.    Critically, upon DR. CORCORAN's execution of the Separation Agreement with FAR WEST DIVISION and HCA MANAGEMENT SERVICES



and during the ensuing intra-company transfer to HWS, the exercise dates for DR. CORCORAN's SARs reflected on the MERRILL LYNCH/HCA platforms continued to display the ten (10)-year exercise window that had been in place throughout DR. CORCORAN's tenure with HCA.

44.    Although he had received the Status Change Letter and actively monitored the MERRILL LYNCH/HCA platforms displaying the customary ten (10)-year exercise window, DR. CORCORAN proactively confirmed with HCA management – and the subject matter expert (SME) over HCA's stock-based compensation program – that his status and exercise window were being reflected accurately.

45.    When DR. CORCORAN contacted HCA's Plan SME, John Dries, on or about March 15, 2022, Mr. Dries ("Mr. Dries") told DR. CORCORAN that he had visibility into HRIS, which displayed a status change from Full Time to Part Time. Mr. Dries, upon viewing this status change, confirmed that the customary ten (10)-year exercise window reflected on the HCA/MERRILL LYNCH systems "would be honored." Mr. Dries made these representations to DR. CORCORAN as HCA's employee and agent.

46.    At this point, DR. CORCORAN had received written and verbal notice that the ten (10)-year exercise window would be honored and reasonably relied upon those representations by HCA and MERRILL LYNCH. DR.

CORCORAN'S reliance was further justified by subsequent conversations with Kevin Barnes at MERRILL LYNCH, as recently as January 2024, confirming that MERRILL LYNCH's systems reflected exercise dates of 2029, 2030, and 2031 for DR. CORCORAN'S SARs.

47.     Had any of the Defendants notified DR. CORCORAN at any time that the ten (10)-year exercise window had been altered or cut short, DR. CORCORAN would have immediately exercised his SARs, which only required the giving of notice of his desire to exercise. At no point did any of the Defendants notify DR. CORCORAN that the ten (10)-year exercise window had been cut short or altered in any way different from the representations made to DR. CORCORAN by HCA and MERRILL LYNCH in March 2022. Indeed, MERRILL LYNCH'S team, including Kevin Barnes and Andy O'Connell, would be notified by HCA of any status changes and routinely notify clients when exercise windows are closing. No such notifications were received by DR. CORCORAN.

48.     Given DR. CORCORAN's superb job performance and the amicable nature of his separation from HCA and transfer to HWS, HCA rewarded DR. CORCORAN with additional stock-based compensation in the form of SARs on or about March 11, 2022 – *after* executing the Separation Agreement.

49.     While working in his interim position at HWS, and throughout 2022 and 2023, *after* executing his Separation Agreement, DR. CORCORAN was



identified in HCA's/HWS's human resources platform as "Part-Time." DR. CORCORAN was never notified of any change in his Part-Time status to trigger a shortened exercise window. Thus, DR. CORCORAN reasonably relied on HCA's and MERRILL LYNCH's representations that the ten (10)-year exercise window for his SARs "would be honored."

50.    Throughout 2022 and 2023, MERRILL LYNCH produced portfolio records and financial plans for DR. CORCORAN, each illustrating the ten (10)-year exercise window. Notably, DR. CORCORAN received a Notice on March 6, 2022 on joint HCA/MERRILL LYNCH letterhead, noting that DR. CORCORAN'S employment status had changed, but reflecting the 2029, 2030, and 2031 SAR exercise expiration dates. *See, Exhibit 3.* At all times while producing these records and plans, MERRILL LYNCH's systems were integrated with those of HCA and at all times reflected a ten (10)-year exercise window.

51.    During DR. CORCORAN's service to HCA and throughout 2022, 2023 and early 2024, the MERRILL LYNCH/HCA platforms consistently reflected the ten (10)-year exercise window.

52.    Throughout 2022 and 2023, and even as late as April 18, 2024, DR. CORCORAN was recruited for interim positions within HWS, receiving weekly recruiting emails from HWS staff for various roles. During this period, DR. CORCORAN was in regular contact with HWS recruiter, Amy Perry.



53.    At various times between 2022 and late 2023, HCA executives including American Group CMO Pranav Mehta, M.D., HCA West Florida Division ("WFD") DCMO Augusto Sepulveda, M.D., and WFD President Jyric Sims approached and solicited DR. CORCORAN for executive interim roles in various HCA hospitals, including facilities in Florida and Texas.

54.    In February 2023, HCA sent DR. CORCORAN a ten (10)-year pin for his <u>continued</u> service, marking DR. CORCORAN'S ten (10)-year work anniversary.

55.    On April 30, 2024, DR. CORCORAN notified his HWS recruiter, Amy Perry, via email that he had recently "celebrated (my) 65th birthday and with more than ten (10) years of employment and experience with HCA, and now meet the company's retirement criteria. Please accept this message as notification that I wish to retire from HCA (and affiliates like HWS)."

56.    On January 30, 2024, using the MERRILL LYNCH/HCA platforms, DR. CORCORAN checked his online account balances reflecting his vested stock-based compensation and confirmed a balance exceeding $1.5 million in value *at the time*, with SARs comprising the majority. As of January 30, 2024, the MERRILL LYNCH/HCA platforms continued to reflect the ten (10)-year exercise windows of 2029, 2030, and 2031.



57.    Shortly thereafter in early February 2024, the Defendants quietly and without notice deleted DR. CORCORAN's SARs, and a portion of DR. CORCORAN's RSUs and PSUs. The only notice DR. CORCORAN received was a sudden change in his online account reflecting a near-zero balance on the MERRILL LYNCH/HCA platforms. DR. CORCORAN discovered the change when checking his accounts on the MERRILL LYNCH/HCA platforms on or about February 6, 2024, when he was alarmed to discover his account balance had dropped to approximately $21,000.00, with nearly $2 million of SARs having vanished into thin air overnight.

58.    None of the Defendants ever provided DR. CORCORAN with any advance notice that the ten (10)-year exercise window had allegedly been shortened, that DR. CORCORAN's status within HCA and HWS had changed in any way, or that DR. CORCORAN was at risk of losing his SARs for failure to exercise the grants.

59.    Pursuant to the Stock Appreciation Rights Agreements (*Composite Exhibit 1*), HCA and its subsidiaries could not "amend any terms of, or alter, suspend, discontinue, cancel or terminate the Award [DR. CORCORAN's vested SARs], prospectively or retroactively" if such "amendment, alteration, suspension, discontinuance, cancellation, or termination" would "adversely affect the rights of



[DR. CORCORAN as Grantee]" "in more than a *de minimis* way" "without the consent of [DR. CORCORAN as the Grantee].

60.    DR. CORCORAN never consented to any amendment, alteration, suspension, discontinuance, cancellation, or termination of his SARs that would adversely affect his rights.

61.    HCA's unilateral cancellation and/or termination of DR. CORCORAN's SARs substantially and negatively impacted him "in more than a *de minimis* way." Yet, HCA and its subsidiaries never sought or obtained DR. CORCORAN's consent.

62.    Upon information and belief, the vested shares to which DR. CORCORAN was entitled through the SARs and other stock-based compensation were returned to HCA's treasury.

63.    DR. CORCORAN called Kevin Barnes at MERRILL LYNCH seeking assurances that his SARs and other stock-based compensation still reflected in his account. Mr. Barnes first stated that DR. CORCORAN must be mistaken, but then called DR. CORCORAN just hours later, perplexed that the SARs and stock-based compensation were *not* in his account. Naturally panicked, during the spring of 2024, DR. CORCORAN repeatedly tried to contact many leaders, managers and directors at HCA, FAR WEST DIVISION, HWS, and MERRILL LYNCH, seeking an explanation and redress for the Defendants' mistakes and/or wrongful taking



of his stock-based compensation. His initial requests to have the grants reinstated were ignored.

64.     DR. CORCORAN contacted SME John Dries, who had told DR. CORCORAN in 2022 that his ten (10)-year exercise window "would be honored". After investigating the abrupt change in early February 2024 and the near wipeout of DR. CORCORAN's MERRILL LYNCH account, Mr. Dries told DR. CORCORAN that the information he accessed indicated that DR. CORCORAN had <u>recently</u> been "terminated retroactive to January 20, 2023".

65.     Mr. Dries confirmed in an email dated February 8, 2024, that "there was an error in the Merrill Lynch system" and that as a result "[DR. CORCORAN's] equity grants did not receive the proper treatment due to [DR. CORCORAN's] involuntary separation from HCA." Mr. Dries confirmed that DR. CORCORAN was entitled to a minimum 180-day exercise window upon termination without cause (referencing Section 3.2(d) of the grant agreement, *see Composite Exhibit 1*).

66.     DR. CORCORAN was initially hopeful that the SARs, PSUs, and RSUs would be restored to his MERRILL LYNCH account, since Mr. Dries wrote on February 8, 2024, that HCA would "get everything back into order."

67.     Around the same time, DR. CORCORAN contacted Jen Berres ("Ms. Berres"), HCA's Chief Human Resources Officer, to seek redress. Ms. Berres



punted the issue to Willette Gatlin ("Ms. Gatlin"), FAR WEST DIVISION's Regional VP of Human Resources. DR. CORCORAN also wrote HCA's CEO Sam Hazen, asking that Mr. Hazen fix the issue, restore the shares, and allow DR. CORCORAN to exercise his SARs without further contest.

68.     As DR. CORCORAN continued asking questions and pressed for HCA to "get everything back in order" as Mr. Dries had reassured him, his access to HCA email accounts, which had been maintained since 2013 and throughout 2022, 2023, and 2024, was abruptly and without notice severed on February 29, 2024.

69.     On or about March 1, 2024, DR. CORCORAN was invited to a Web-Ex meeting with Ms. Gatlin, Mr. Dries (HCA's SME on stock-based compensation), and Tom Scholzen, another HCA executive. During this call, Ms. Gatlin recognized that Mr. Dries had confirmed that DR. CORCORAN's ten (10)-year exercise window would be honored and admitted to "misinformation" and "discrepancies" in HCA's handling of DR. CORCORAN's internal transition from FAR WEST DIVISION to HWS.

70.     On the same call, DR. CORCORAN was informed for the first time that HCA had unilaterally decided to "treat January 20, 2023" as DR. CORCORAN's termination date, triggering a 180-day exercise window for DR. CORCORAN's SARs of which he was never informed.

71.    DR. CORCORAN asked Ms. Gatlin to reduce the conversation to writing, and on March 6, 2024, Ms. Gatlin wrote DR. CORCORAN, memorializing the conversation. Ms. Gatlin attempted to re-frame HCA's unilateral decision to "treat January 20, 2023" as DR. CORCORAN's termination date as something that had been agreed upon. *See* email from Ms. Gatlin to DR. CORCORAN dated March 6, 2024, *attached as **Exhibit 4.*** DR. CORCORAN never agreed to January 20, 2023, as a termination date, especially given that he had never been provided notice of this alleged termination date.

72.    Over several communications in spring 2024, HCA and HWS provided various and conflicting explanations through their leaders, managers and directors, variously blaming the deletion of DR. CORCORAN's vested stock rights to "miscommunications," "discrepancies," "errors," "misinformation," and even "a system error at Merrill Lynch."

73.    MERRILL LYNCH characterized the taking by HCA as "unprecedented," and blamed the unprecedented error on HCA, without further explanation.

74.    MERRILL LYNCH informed Plaintiff that all grants which were terminated/cancelled due to HCA's malfeasance could be restored overnight upon notification from HCA. Yet, at no point has HCA taken the reasonable step



of restoring Plaintiff's SARs by providing proper notification to MERRILL LYNCH.

75.    DR. CORCORAN has continued to seek explanation and redress from HCA and MERRILL LYNCH, without effect. DR. CORCORAN has made multiple demands for the SARs and other stock-based compensation to be returned to his account. Defendants have refused, citing the aforementioned errors and discrepancies and other incoherent administrative explanations.

76.    Pursuant to HCA's stock-based compensation program, DR. CORCORAN should have been provided notice and a 180-day exercise window upon any change in status or termination triggering a shortened exercise period.

77.    Aware of his right to a minimum 180-day exercise window under HCA's stock-based compensation program, DR. CORCORAN attempted to exercise his rights and recover the value of his SARs within the 180-day period triggered by HCA's unilateral actions of early February 2024. A copy of DR. CORCORAN's notice of exercising his SAR rights is *attached as **Exhibit 5***.

78.    HCA first notified DR. CORCORAN of his termination of employment on or about March 1, 2024, as memorialized in Ms. Gatlin's March 6, 2024, email *attached as Exhibit 4*.

79.    Despite communicating clearly his intent in writing to exercise his rights within the applicable 180-day exercise window triggered by DR.

CORCORAN's first notification of termination, consistent with the Stock Appreciation Rights Agreement's requirements, the Defendants have obstinately refused to honor DR. CORCORAN's request.

80.    As a result of Defendants' actions, DR. CORCORAN has been forced to return to full-time employment, once again living away from his family, in an effort to rebuild his retirement savings.

81.    DR. CORCORAN has been damaged due to Defendants' acts and omissions.

82.    All conditions precedent to the filing of this action have been satisfied.

## CAUSES OF ACTION

### Count I - Conversion against HCA

83.    Plaintiff re-alleges paragraphs 1 - 82 as though fully set forth herein.

84.    On or about February 5, 2024, Defendant HCA converted to its own use and enrichment SARs that were then the property of Plaintiff in the approximate value of $2 million.[2]

85.    Since Plaintiff's SARs were vested, they were Plaintiff's property.

---

[2] This value is an approximation only. Since the SARs at issue are stock-based compensation, the value of the converted SARs fluctuates, and has markedly increased since February 2024.



86.     The HCA/MERRILL LYNCH platforms, through which the Plaintiff accessed and monitored the market value of his SARs, confirmed that Plaintiff had rightful possession of the property.

87.     Defendant HCA deprived Plaintiff of his property without authorization.

88.     Defendant HCA has exercised wrongful dominion over Plaintiff's property to the detriment of Plaintiff's rights as the lawful owner of the SARs.

89.     Plaintiff has made multiple demands for the return of his property, and Defendant HCA has refused to return Plaintiff's SARs.

WHEREFORE, Plaintiff demands judgment for damages comprised of the property's value converted plus legal interest against Defendant HCA.

## Count II - Promissory Estoppel against HCA

90.     Plaintiff re-alleges paragraphs 1 - 82 as though fully set forth herein.

91.     Plaintiff detrimentally relied on Defendant HCA's promise to honor the ten (10)-year exercise window reflected on the HCA/MERRILL LYNCH platforms after executing the Separation Agreement.

92.     HCA's promise that the ten (10)-year exercise window would be honored was material and is contrary to HCA's later-asserted position that some other as-of-yet unexplained event or circumstance triggered a shortened exercise window.

93.    Defendant HCA should have reasonably expected its promise to induce reliance in the form of Plaintiff's action or forbearance - specifically, waiting to exercise his SARs at a reasonable time within the ten (10)-year exercise window.

94.    Plaintiff reasonably relied on HCA's promise to honor the ten (10)-year exercise window.

95.    Plaintiff would have exercised his SARs in 2022, but changed his position and decided to patiently wait to exercise his SARs, reasonably relying on HCA's promise to honor the ten (10)-year exercise window.

96.    Injustice can be avoided only by enforcing HCA's promise to honor the ten (10)-year exercise window.

WHEREFORE, Plaintiff demands judgment for damages against Defendant HCA.

### Count III - Fraud against HCA

97.    Plaintiff re-alleges paragraphs 1 - 82 as though fully set forth herein.

98.    Defendant HCA made a false statement concerning a material fact when it provided Plaintiff with a Status Change Letter reflecting that Plaintiff's ten (10)-year exercise window remained in effect after Plaintiff signed his Separation Agreement.



99.    HCA's false statement was communicated on HCA Healthcare letterhead, via the March 6, 2022, Status Change Letter *attached as Exhibit 3.*

100.    Defendant HCA made a false statement concerning a material fact, by and through its executive and agent, John Dries, when he told Plaintiff that HCA would honor the ten (10)-year exercise window for Plaintiff's SARs.

101.    Mr. Dries' statement that Plaintiff's ten (10)-year exercise window "would be honored" was made on or about March 15, 2022.

102.    HCA's Compensation representatives further told Plaintiff on or about March 15, 2022, that vesting of his SARs and stock-based compensation would continue as long as Plaintiff remained employed by HCA through HWS.

103.    When these statements of material fact were made to the Plaintiff in March 2022, HCA knew that they were false.

104.    HCA intended for Plaintiff to rely on its representations that it would honor the ten (10)-year exercise window and that vesting of his SARs would continue as long as he remained employed by HCA through HWS, and intended to induce Plaintiff's inaction in failing to timely exercise his SARs.

105.    HCA intended for Plaintiff to rely on its failure to communicate any change in the applicable exercise window after the March 2022 misrepresentations and intended to induce Plaintiff's inaction in failing to timely exercise his SARs.



106.    HCA induced Plaintiff's reliance by failing to notify Plaintiff of any change in the exercise window for his SARs.

107.    HCA's SME, John Dries, confirmed in March 2024 that HCA had retroactively altered DR. CORCORAN's status in HRIS to "Terminated" and backdated the termination to January 20, 2023. HCA's Chief Human Resources Officer, Jen Berres, also confirmed in March 2024 that HCA had changed Plaintiff's status to "Terminated".

108.    HCA induced Plaintiff's reliance by failing to notify Plaintiff of any change in the exercise window for his SARs, and Mr. Dries admitted that the change in HCA's HRIS <u>was made</u> in February 2024 and retroactively dated to January 20, 2023.

109.    HCA induced Plaintiff's reliance, and in fact forced Plaintiff's reliance, by backdating a retroactive termination and, in doing so, denying Plaintiff any opportunity to exercise his SARs.

110.    Willette Gatlin, the Regional VP of Human Resources for FAR WEST DIVISION confirmed by email on March 6, 2024, that Plaintiff had been told by Compensation "that the vesting would continue as long as [Plaintiff] remained employed by the Company [HCA]."



111.    Ms. Gatlin further admitted in the same email that HCA had made false statements to Plaintiff, euphemistically using the term "misinformation" to describe HCA's false statements.

112.    Ms. Berres admitted that Plaintiff had been "given conflicting information" and that Plaintiff "should have been given 180 days to exercise [his] SARs" in an email she sent to Plaintiff on March 13, 2024, and that there had been "some miscommunications" in an email she sent to Plaintiff on March 18, 2024.

113.    As a direct and proximate result of HCA's fraud, Plaintiff incurred damages and consequent injury by relying on HCA's representation that it would honor the ten (10)-year exercise window.

WHEREFORE, Plaintiff demands judgment for damages against Defendant HCA.

### Count IV - Civil Theft against HCA

114.    Plaintiff re-alleges paragraphs 1 – 82 as though fully set forth herein.

115.    Under Section 812.035, Florida Statutes, Plaintiff alleges that HCA's actions rise to civil theft.

116.    The Plaintiff has repeatedly demanded the return of his property—in the form of vested SARs, PSUs and RSUs—from HCA.



117.    On or about October 2, 2024, Plaintiff made a written demand upon HCA for the return of the property and further notified HCA of his intent to seek treble damages if HCA did not return such property within thirty (30) days.

118.    HCA did not respond within the statutory waiting period of thirty (30) days or otherwise refused to comply with Plaintiff's demand.

119.    HCA's conduct is theft under Section 812.014, Florida Statutes, as Plaintiff had and has the right to possess his SARs and has demanded the return of his property, but the property has not been relinquished.

120.    Plaintiff demands judgment for treble damages, attorney's fees, and any other just relief against HCA.

WHEREFORE, Plaintiff demands judgment for damages against Defendant HCA.

## Count V – Breach of Contract against HCA

121.    Plaintiff re-alleges paragraphs 1 - 82 as though fully set forth herein.

122.    The Stock Appreciation Rights Agreement between Plaintiff and HCA constituted a binding and enforceable contract.

123.    As an express provision of the contract, HCA agreed in Section 5.6 that it could not "amend any terms of, or alter, suspend, discontinue, cancel or terminate the Award [DR. CORCORAN's vested SARs], prospectively or retroactively" if such "amendment, alteration, suspension, discontinuance,



cancellation, or termination" would "adversely affect the rights of [DR. CORCORAN's as Grantee]" "in more than a *de minimis* way" "without the consent of [DR. CORCORAN as the Grantee].

124.   DR. CORCORAN never consented to any amendment, alteration, suspension, discontinuance, cancellation, or termination of his SARs that would adversely affect his rights.

125.   HCA's unilateral cancellation and/or termination of DR. CORCORAN's SARs substantially and negatively impacted him "in more than a *de minimis* way." Yet, HCA and its subsidiaries never sought or obtained DR. CORCORAN's consent.

126.   As an additional express provision of the contract, HCA agreed to provide notice to DR. CORCORAN using procedures specified in Section 5.3.

127.   HCA failed to provide notice to DR. CORCORAN of any change in employment status or any other decision by HCA adversely affecting DR. CORCORAN's rights.

128.   HCA materially breached the contract by failing to obtain DR. CORCORAN's consent, and further materially breached the contract by failing to provide the requisite notice.

129.   In the alternative, HCA entered into a modification of the contract through its representatives, including Mr. Dries, who confirmed to DR.



CORCORAN that the ten (10)-year exercise window reflecting in HCA's/MERRILL LYNCH's systems in 2022 and 2023 "would be honored."

130.    HCA's modification and amendment to the contract honoring the ten (10)-year exercise windows, which DR. CORCORAN consented to, constituted a binding, enforceable contract.

131.    HCA breached this contract by unilaterally deciding to reverse or dishonor its decision, as conveyed by Mr. Dries as HCA's employee and agent, and terminating DR. CORCORAN's SARs and/or imposing a shortened exercise window without notice or consent.

132.    The Company's material breach(es) directly and proximately damaged the Plaintiff.

WHEREFORE, Plaintiff demands judgment against HCA.

### Count VI - Constructive Fraud against MERRILL LYNCH

133.    Plaintiff re-alleges paragraphs 1 - 82 as though fully set forth herein.

134.    MERRILL LYNCH owed Plaintiff a duty under a fiduciary relationship due to MERRILL LYNCH's undertaking to oversee, manage, maintain, and effect Plaintiff's exercise rights and options about Plaintiff's stock-based compensation, including Plaintiff's SARs.

135.    MERRILL LYNCH abused its fiduciary relationship and took unconscionable advantage of Plaintiff by failing to notify Plaintiff of any shortened



exercise window and by allowing HCA to withdraw or otherwise nullify Plaintiff's vested property rights in the form of SARs, PSUs, and RSUs maintained on the MERRILL LYNCH platform and managed by MERRILL LYNCH.

136.   MERRILL LYNCH misrepresented the duration of the exercise window on its platform or, in the alternative, concealed HCA's intent to take Plaintiff's SARs, and failed to notify Plaintiff of HCA's intentions.

137.   MERRILL LYNCH either made false representations to Plaintiff, intentionally concealed material facts from Plaintiff, and/or failed to disclose material facts that it knew Plaintiff needed to know.

138.   MERRILL LYNCH's deception, failure to disclose, and/or concealment directly and proximately injured Plaintiff.

WHEREFORE, Plaintiff demands judgment against MERRILL LYNCH.

### Count VII - Breach of Fiduciary Duty against MERRILL LYNCH

139.   Plaintiff re-alleges paragraphs 1 - 82 as though fully set forth herein.

140.   Defendant MERRILL LYNCH owed Plaintiff a fiduciary duty in overseeing, managing, and maintaining Plaintiff's stock-based compensation portfolio, including his SARs.

141.   The services provided to Plaintiff by MERRILL LYNCH exceeded those of an ordinary banking relationship and constituted a special relationship of trust between Plaintiff and MERRILL LYNCH.

142.    Defendant MERRILL LYNCH owed Plaintiff a fiduciary duty to advise Plaintiff of his rights and options concerning his stock-based compensation portfolio, including his SARs.

143.    Defendant MERRILL LYNCH owed Plaintiff a fiduciary duty to notify and inform Plaintiff of any status changes that would materially affect his legal rights and options concerning his stock-based compensation portfolio and to ensure that Plaintiff was fully advised of any alteration to his exercise window to avoid losing rights to vested shares.

144.    Defendant MERRILL LYNCH owed Plaintiff a fiduciary duty to coordinate with HCA and protect Plaintiff's stock-based compensation portfolio from unlawful conversions or takings by third parties such as HCA.

145.    Defendant MERRILL LYNCH breached its fiduciary duty by failing to advise Plaintiff of a shortened exercise window, instead continuously representing to Plaintiff via MERRILL LYNCH's platform that the ten (10)-year exercise window remained in effect up and until the time that Plaintiff's SAR balance was zeroed-out without any advance notice.

146.    Defendant MERRILL LYNCH breached its fiduciary duty by failing to refuse to comply with HCA's unilateral and unlawful decision to convert Plaintiff's SARs, and by failing to disclose to Plaintiff HCA's wrongful intentions and actions.

147.    Defendant MERRILL LYNCH breached its fiduciary duty by failing to advise Plaintiff at any time that his SARs were at risk and subject to being converted or otherwise taken by HCA due to Plaintiff's failure to exercise his SARs.

148.    As a direct and proximate result of MERRILL LYNCH's breaches of its fiduciary duties, Plaintiff was damaged.

WHEREFORE, Plaintiff demands judgment against MERRILL LYNCH.

## Count VIII – Breach of Contract against FAR WEST DIVISION and HCA MANAGEMENT SERVICES

149.    Plaintiff re-alleges paragraphs 1 -82 as though fully set forth herein.

150.    The Separation Agreement between Plaintiff and FAR WEST DIVISION and HCA MANAGEMENT SERVICES (collectively, the "Company") constituted a binding and enforceable contract.

151.    As an express provision of the contract, the Company agreed to honor Plaintiff's entitlement to vested incentive compensation and, further, to communicate the contract terms to HCA and its subsidiaries and affiliates to ensure that HCA understood that Plaintiff's vested incentive compensation was to be honored.

152.   The Company materially breached the contract by failing to communicate the terms of the agreement, failing to honor the contract, and failing to protect the Plaintiff from HCA's malfeasance.

153.   The Company's material breach(es) directly and proximately damaged the plaintiff.

WHEREFORE, Plaintiff demands judgment against FAR WEST DIVISION and HCA MANAGEMENT SERVICES.

### Count IX – Constructive Fraud against FAR WEST DIVISION and HCA MANAGEMENT SERVICES

154.   Plaintiff re-alleges paragraphs 1 - 82 as though fully set forth herein.

155.   In arranging for a transfer within HCA and entering into the associated Separation Agreement, FAR WEST DIVISION and HCA MANAGEMENT SERVICES assumed a position of confidence and undertook a fiduciary duty with respect to Plaintiff.

156.   The Separation Agreement included an express provision ensuring its confidentiality, further solidifying the confidential relationship between Plaintiff, FAR WEST DIVISION, and HCA MANAGEMENT SERVICES.

157.   FAR WEST DIVISION and HCA MANAGEMENT SERVICES owed Plaintiff a fiduciary duty to protect him from malfeasance within HCA and protect



the vested incentive compensation that was explicitly carved out of the Separation Agreement.

158.    FAR WEST DIVISION and HCA MANAGEMENT SERVICES further owed Plaintiff a fiduciary duty to ensure that HCA was fully informed of the terms of Plaintiff's separation and intra-company transfer, including Plaintiff's rightful ownership of his vested incentive compensation.

159.    FAR WEST DIVISION and HCA MANAGEMENT SERVICES abused the confidential and fiduciary relationship by failing to inform the other Defendants of the terms of the Separation Agreement, including Plaintiff's entitlement to vested incentive compensation.

160.    In the alternative, FAR WEST DIVISION and HCA MANAGEMENT SERVICES abused the confidential and fiduciary relationship. They defrauded Plaintiff by implying that they had sufficient control over Plaintiff's vested incentive compensation to protect him from HCA's wrongdoing or attempts to interfere with Plaintiff's rights.

161.    In the alternative, FAR WEST DIVISION and HCA MANAGEMENT SERVICES abused the confidential and fiduciary relationship by refusing to protect the Plaintiff from the malfeasance of the remaining Defendants, playing dumb, and refusing to assist the Plaintiff in recovering his SARs and other stock-based compensation following the events of February 2024.



162.    FAR WEST DIVISION's and HCA MANAGEMENT SERVICES' abuse of the relationship with Plaintiff has caused unconscionable harm to Plaintiff, and to the extent FAR WEST DIVISION and HCA MANAGEMENT SERVICES benefit from $3 million (the approximate present value) of stock wrongfully held in HCA's treasury, unconscionable advantage.

WHEREFORE, Plaintiff demands judgment against FAR WEST DIVISION and HCA MANAGEMENT SERVICES.

### Count X - Civil Conspiracy against All Defendants

163.    Plaintiff re-alleges paragraphs 1 - 82 as though fully set forth herein.

164.    Defendants conspired to take Plaintiff's SARs - property in which Plaintiff had a vested ownership interest.

165.    Defendants committed an unlawful act in taking Plaintiff's SARs or, in the alternative, committed a lawful act by unlawful means.

166.    Defendants took overt action to pursue the conspiracy by nullifying Plaintiff's SARs on the HCA/MERRILL LYNCH platforms, eliminating evidence of Plaintiff's rightful ownership of the SARs, and refusing to return Plaintiff's property upon demand.

167.    Defendants' actions were coordinated in that HCA and MERRILL LYNCH cooperate to manage and maintain the data in the HCA/MERRILL LYNCH platforms reflecting Plaintiff's SARs and other HCA employee stock-



based compensation and, suddenly and without notice to Plaintiff, on or about February 1, 2024, Plaintiff's SAR balance on the HCA/MERRILL LYNCH platforms was zeroed out.

168.   Defendants' actions were further coordinated in that FAR WEST DIVISION and HCA MANAGEMENT SERVICES and HWS, as subsidiaries and affiliates of HCA, had perfect knowledge of DR. CORCORAN's continued employment and the promises made to DR. CORCORAN regarding the exercise dates of his SARs being honored. Despite the terms of DR. CORCORAN's Separation Agreement expressly entitling him to his vested incentive compensation, these Defendants coordinated to conceal their theft and collectively refused to honor DR. CORCORAN's reasonable requests to return his SARs and other stock-based compensation.

169.   As a direct and proximate result of Defendants' coordinated actions, Plaintiff was damaged.

170.   Defendants are jointly and severally liable for Plaintiff's damages flowing from the conspiracy.

WHEREFORE, Plaintiff demands judgment for damages against all Defendants.

### Count XI — Negligence against All Defendants

171.   Plaintiff re-alleges paragraphs 1 - 82 as though fully set forth herein.



172.    Defendants HCA, FAR WEST DIVISION, HCA MANAGEMENT SERVICES, HWS, and MERRILL LYNCH owed Plaintiff a duty of care to manage, monitor, and protect Plaintiff's stock-based compensation and exercise rights under the applicable stock-based compensation plans and Stock Appreciation Rights Agreements.

173.    Defendants owed Plaintiff a duty of care to keep him timely and accurately informed of his employment status and notify him of any change in status with HCA and/or its subsidiaries that would affect his legal rights, in particular, his ability to maintain and/or exercise his SARs and other stock-based and incentive compensation.

174.    Defendants breached their duty of care by, for example and without limitation:

    a.    Failing to accurately communicate Plaintiff's employment status internally and amongst the Defendants to ensure that Plaintiff received accurate and actionable information;

    b.    Failing to notify Plaintiff of changes to his employment status within HCA and its subsidiaries and affiliates in a timely manner;

    c.    Failing to notify Plaintiff of changes to the applicable exercise window for his SARs;



d.  Failing to maintain accurate and up-to-date information on the stock compensation platforms maintained by HCA/MERRILL LYNCH;

e.  Failing to provide Plaintiff an updated Status Change Letter at any time in 2023 or 2024 to advise Plaintiff of the allegedly altered Last Date to Exercise;

f.  Allowing and/or causing Plaintiff's vested SARs to be zeroed out without proper notice or opportunity to exercise; and

g.  Failing to correct the "system errors"/"miscommunications"/"misinformation" that caused Plaintiff substantial losses through the termination/cancellation/expiration of his SARs and other stock-based compensation.

175.  As a direct and proximate result of Defendants' breaches of their duty of care, Plaintiff lost the value of his SARs, amounting to approximately $3 million at present value.

176.  Plaintiff has suffered significant financial damages, including the loss of vested stock compensation, the depletion of retirement funds, and emotional distress due to the sudden and unexpected loss of his savings.

WHEREFORE, Plaintiff demands judgment for damages against Defendants.



## Count XII — Declaratory Judgment against HCA

177.   Plaintiff re-alleges paragraphs 1 - 82 as though fully set forth herein.

178.   Plaintiff properly notified Defendant HCA of his intent to exercise his SAR options on or before 180 days following notice of termination.

179.   An actual and justiciable controversy exists between Plaintiff and Defendant HCA as to whether Plaintiff effectively exercised his Stock Appreciation Rights (SARs) within the 180-day exercise period following his termination, as required under HCA's stock compensation plan.

180.   Plaintiff entered into a Separation Agreement with Defendants in February 2022, and the Agreement specifically preserved his entitlement to receive a full-year share of incentive rewards and vested stock-based compensation, including SARs.

181.   Following his separation from FAR WEST DIVISION and transition to HWS, and in reliance on Defendants' representations, Plaintiff reasonably believed that his SAR rights remained intact with a ten (10)-year exercise window, as reflected in Defendants' platforms and verbal assurances.

182.   After learning of the changes in his account balance in February 2024, Plaintiff promptly notified Defendants of his intent to exercise his SARs within the 180-day period as per HCA's stock compensation program. *See Exhibit 5.*



183.    Defendants failed to provide proper notice of any change in Plaintiff's exercise window or status that would have triggered any shortened exercise period, in violation of HCA's stock-based compensation program and Plaintiff's contractual rights. In contrast to the Status Change Letter Plaintiff received in connection with his February 1 separation, *see Exhibit 3*, no such communication was provided to Plaintiff ahead of the termination/cancellation of his stock-based compensation in early 2024.

184.    Under the Separation Agreement and HCA's stock compensation program, Plaintiff was entitled to at least 180 days to exercise his SARs following termination or a change in status, and the exercise window should have been preserved under the terms of the Separation Agreement.

185.    Plaintiff seeks a declaratory judgment from the court declaring that:

a.    Plaintiff properly exercised his SARs within the 180-day period following notice of his termination or, in the alternative,

b.    Plaintiff's right to exercise the SARs remains intact and has not been forfeited, given the lack of proper notice from Defendants.

WHEREFORE, Plaintiff requests that the Court enter a judgment declaring that Plaintiff effectively exercised his SARs prior to the expiration of the applicable exercise window and that his rights to the SARs should be honored by Defendants.



**Count XIII — Violation of 26 U.S.C. § 7434 – Fraudulent Information Returns against HEALTHTRUST WORKFORCE SOLUTIONS and HCA**

185.    Plaintiff re-alleges paragraphs 1-82 as though fully set forth herein.

186.    Under 26 U.S.C. § 7434, any person who willfully files a fraudulent information return with respect to payments purported to be made to another person may be liable for civil damages.

187.    HWS and/or HCA willfully filed a fraudulent W-2 for tax year 2024, purporting to reflect compensation paid to Plaintiff of $416,982.68.[3]

188.    At the time HWS and/or HCA filed this W-2, HCA claimed through its representatives  Ms. Berres and Ms. Gatlin that DR. CORCORAN was terminated as of March 1, 2022, and that HCA was "treat[ing]" January 20, 2023 as DR. CORCORAN's termination date. According to HCA's own statements, DR. CORCORAN was not employed by HWS nor HCA in 2024.

189.    Based on HCA's representations, HWS and/or HCA knew that the W-2 was false when filed and its filing was willful and knowing. HCA's and HWS's fraudulent reporting followed a protracted period of discord between the parties and DR. CORCORAN was not on HWS's payroll when the fraudulent W-2 was filed.

---

[3] The fraudulent W-2 DR. CORCORAN received was issued by CHC Payroll Agent, Inc. the payroll agent utilized by both HCA and HWS.



190.    Before pursuing this relief, DR. CORCORAN twice requested that HWS and HCA correct their mistake, but his request was refused and nonchalantly brushed off. The Defendants' refusal to correct their mistake demonstrates the willfulness of their actions.

191.    HWS's and/or HCA's filing of the fraudulent W-2 has caused Plaintiff to incur damages, including increased tax liabilities, costs of professional tax services to address the fraudulent filing, and attorneys' fees.

192.    Before incurring these damages, Plaintiff requested that HWS and HCA correct the false information return, but received no reasonable explanation for the fraudulent W-2. As a result, Plaintiff has incurred damages through the payment of taxes in connection with his 2024 tax return based on the fraudulent W-2.

193.    Pursuant to 26 U.S.C. § 7434(b), Plaintiff is entitled to damages in the amount of the greater of $5,000 or the sum of actual damages, costs attributable to resolving deficiencies asserted as a result of the fraudulent W-2, plus costs of the action and reasonable attorneys' fees.

WHEREFORE, Plaintiff demands judgment against Defendants HWS and HCA for damages in the amount of the greater of $5,000.00 or actual damages, costs attributable to resolving deficiencies asserted as a result of the fraudulent W-2, plus costs and reasonable attorneys' fees. Plaintiff further requests that in

awarding damages, the Court include a finding of the correct amount that should have been reported in the information return pursuant to 26 U.S.C. § 7434(e).

### Count XIV — Negligent Misrepresentation In Tax Reporting against HEALTHTRUST WORKFORCE SOLUTIONS and HCA

194.    Plaintiff re-alleges paragraphs 1-82 as though fully set forth herein.

195.    HCA and HWS owed Plaintiff a duty to prepare and issue accurate tax documentation. The Defendants' duty flows from the former employer-employee relationship and IRS regulations requiring accurate tax reporting by entities such as HCA and HWS.

196.    HCA and HWS breached this duty by issuing a W-2 for tax year 2024 that incorrectly represented that Plaintiff received compensation of $416,982.68 from HWS in 2024, when HCA claims that Plaintiff was terminated in early 2023.

197.    HCA and HWS failed to exercise reasonable care in the preparation and issuance of Plaintiff's tax documentation.

198.    HCA and HWS knew or should have known that Plaintiff would rely on the W-2 for tax filing purposes. In fact, DR. CORCORAN attempted to resolve the negligent reporting to the IRS by twice asking for a corrected W-2 or an explanation of the W-2 income HWS had reported.



199.    When HCA and HWS refused to issue a corrected W-2, Plaintiff reasonably relied on the the W-2 issued by HWS to his detriment and paid taxes on the imaginary income to avoid IRS penalties and interest.

200.    As a direct and proximate result of HCA's and HWS's negligent misrepresentation, Plaintiff has suffered damages, including increased tax liabilities, accounting fees, attorneys' fees and costs of this action, and other financial harm including interest expense on a line of credit.

WHEREFORE, Plaintiff demands judgment for damages against Defendant HCA and HWS.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

## RESERVATION OF RIGHT TO PLEAD PUNITIVE DAMAGES

Plaintiff reserves his right to plead punitive damages for Defendants' willful, improper conduct pursuant to Florida law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter final judgment in favor of Plaintiff and against Defendants on all counts, plus costs and all attorneys' fees to which Plaintiff is legally entitled, as well as all such further relief as the Court determines necessary and just.



Dated: June 6, 2025.

Childers Law, LLC
2135 NW 40th Terrace, Suite B
Gainesville, Florida 32605
tel 866-996-6104  fax 407-209-3870
net jchilders@smartbizlaw.com

/s/ Seldon J. Childers
Seldon J. Childers
Florida Bar No. 61112
Nicholas P. Whitney
Florida Bar No. 119450
jchilders@smartbizlaw.com
nwhitney@smartbizlaw.com
notice@smartbizlaw.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing document (including any attached exhibits and documents) electronically with the Clerk of the Court using CM/ECF on June 6, 2025, which served same electronically upon all counsel of record.

*/s/ Seldon J. Childers*
Attorney

